## ASSET PURCHASE AGREEMENT

**AGREEMENT** entered into on April **15**, 2014, to be effective as of the Effective Date, as herein defined, by and between Clarkson and Korn, LLC ("Buyer"), Korn Law Firm, P.A. of South Carolina ("Seller") and Peter D. Korn, individually ("Guarantor").

### WITNESSETH

**WHEREAS**, Seller owns and operates a collection firm within the state of South Carolina, (the "Business") at 1300 Pickens Street, Columbia, South Carolina, 29201, various assets of which Buyer desires to purchase and Seller desires to sell, all upon the terms and conditions hereinafter set forth.

**NOW, THEREFORE**, in consideration of the premises and the mutual promises herein made, and in consideration of the representations, warranties, and covenants herein contained, the Parties, intending to be legally bound, agree as follows.

### ARTICLE I
### Definitions

1.1 <u>Terms Defined</u>. The following terms shall be defined as indicated below, in all instances in which they are used throughout this Agreement except when specifically indicated otherwise.

"Acquired Assets", means (with the exception of the Excluded Assets identified on Exhibit "B" attached hereto) all Seller's right, title, and interest in and to various assets including, without limitation, any real, personal, tangible or intangible assets, which are owned or used in any way in connection with the operation, administration or management of the Business, including, without limitation, the following:

    (1)      the Trade Name, Clarkson and Korn, LLC and related names,

    (2)      all Inventory, Equipment, Furniture, Fixtures, computer hardware, computer software, and phone networks used in connection with the operation of the collection business, including, without limitation, those identified on Exhibit "A" attached hereto.

    (3)      the customer base of Business, which shall include without limitation, all records, names, addresses, phone numbers, copies of correspondence with and other documentation in any way affecting or related to the relationship between Seller and the Customers of the Business including, but not limited to, those customers identified on Exhibit "C" attached hereto,

    (4)      all permits, licenses, orders, registrations, certificates, variances, and similar rights, if any, obtained from governments and governmental agencies pertaining to the Business,

[Type text]

**EXHIBIT "A", Page 1 of 47**

(5)     books, records, ledgers, files, documents, correspondence, lists, advertising and promotional materials, studies, reports, and other printed or written materials relative to the Business,

(6)     all prepaid expenses,

(7)     all trade accounts receivable and all rights to receive payments arising out of sales or services rendered, together with the proceeds in respect of any such accounts receivable which are received after April 30, 2014 (the "**Accounts Receivable**");

(8)     to the extent assignable or transferable, all guarantees and warranties of third parties to the extent they relate to the ownership or operation of the Business or the Purchased Assets;

(9)     all computer software programs, databases and all documentation related thereto, the financial consolidation software, and all software used in the operation of the wide area network routers and e-mail servers ("**Computer Software**") owned by Seller and used in the Business;

(10)    Seller's archived and available Internet mail used in the Business;

(11)    all of the goodwill associated with the collection Business (the "**Goodwill**");

(12)    all office and other supplies of the Business (including containers, labels, and packaging items), and other accessories related thereto owned by Seller;

(13)    all other assets and properties of every kind and nature owned or held by Seller, or in which Seller has an interest, known or unknown, fixed, unfixed, choate or inchoate, accrued, absolute, contingent, or otherwise, whether or not specifically referred to in this Agreement (the "**Other Assets**").

"Adverse Consequences" means all charges, complaints, actions, suits, proceedings, hearings, investigations, claims, demands, judgments, orders, decrees, stipulations, injunctions, damages, dues, penalties, fines, costs, amounts paid in settlement, liabilities, obligations, taxes, liens, losses, expenses, and fees, including all attorneys' fees and court costs.

"Affiliate" means a person, partnership, corporation or other entity which directly or indirectly through one or more intermediaries, controls, or is controlled by, or is under common control with, the Party specified.

"Agreement" means this Asset Purchase Agreement.

[Type text]

"Assumed Liabilities" means only those liabilities, if any, specifically listed on Exhibit "E" attached hereto,

"Confidential Information" means any information concerning the business and affairs of the Business.

"Effective Date" shall mean May 1, 2014 at 8:30 a.m.

"Intellectual Property" means all (a) patents, patent applications, patent disclosures, and improvements thereto, (b) trademarks, service marks, trade dress, logos, trade names, and corporate names and registrations and applications for registrations thereof, (c) copyrights and registrations and applications for registration thereof, (d) mask works and registrations and applications for registration thereof, (e) computer software, data, and documentation, (f) trade secrets and confidential business information (including ideas, formulas, compositions, inventions (whether patentable or un-patentable and whether or not reduced to practice), know-how, manufacturing and production processes and techniques, research and development information, drawings, specifications, designs, plans, proposals, technical data, copyrightable works, financial, marketing, and business data, pricing and cost information, business and marketing plans, and customer and supplier lists and information), (g) other proprietary rights, and (h) copies and tangible embodiments thereof (in whatever form or medium), but only as pertains to the business or its business operations.

"Knowledge" means actual knowledge after reasonable investigation.

"Liability" means any liability (whether known or unknown, whether absolute or contingent, whether liquidated or unliquidated, and whether due or to become due), including any liability for Taxes.

"Ordinary Course of Business" means the ordinary course of business consistent with past custom and practice (including with respect to quantity and frequency).

"Security Interest" means any mortgage, pledge, security interest, encumbrance, charge, or other lien.

"Subsidiary" means any corporation with respect to which another specified corporation has the power to vote or direct the voting of sufficient securities to elect a majority of the directors.

[Type text]

**EXHIBIT "A", Page 3 of 47**

"Tax" means any federal, state, local, or foreign income, gross receipts, capital stock, franchise, profits, withholding, social security, unemployment, disability, real property, personal property, stamp, excise, occupation, sales, use, transfer, value added, alternative minimum, estimated, or other tax, including any interest, penalty, or addition thereto, whether disputed or not.

1.2    Other Terms. Other terms, not specifically listed above may be defined elsewhere in this Agreement. Such terms shall be interpreted as bearing the same definition throughout this Agreement as in the place where they are defined.

### ARTICLE II

### Sale of Assets

2.1    Purchase and Sale of Assets. On and subject to the terms and conditions of this Agreement, the Buyer agrees to purchase from the Seller, and the Seller agrees to sell, transfer, convey, and deliver to the Buyer, all of the Acquired Assets at the Closing for the Purchase Price specified below in Section 2.3.

2.2    Non-Assumption of Liabilities. With the exception only of those contractual obligations shown on Exhibit "E", it is specifically agreed and acknowledged that Buyer shall not assume or otherwise be liable for any liabilities or obligations, fixed or contingent, known or unknown, first incurred by Seller or to which its collection business or assets first became subject prior to the Closing (as hereinafter defined); any liabilities for taxes arising from the operation of its collection business prior to Closing or any taxes incurred by Seller in connection with this Agreement and the sale of the Purchased Assets contemplated hereby; any indebtedness of Seller; any liabilities relating to any breach of contract, breach of warranty, tort, infringement, or violation of law by Seller; any liability arising from or relating to the termination of any employee of Seller; any liability arising from any employee benefit plans of Seller; and any other liability of Seller not expressly assumed pursuant to this Agreement (collectively the "**Excluded Liabilities**"). Without

[Type text]

**EXHIBIT "A", Page 4 of 47**

limiting the generality of the foregoing, Buyer shall not assume any liabilities of Seller for taxes payable, member loans or other debt.

2.3    Purchase Price and Other Consideration. Subject to Seller's full and complete compliance with all of the terms and conditions of this Agreement, and any and all agreements entered into pursuant hereto, including, without limitation, Seller's compliance with a covenant not to compete, all as more fully hereinafter enumerated, Buyer agrees to pay to the Seller the sum of Two Hundred and Fifty Thousand and no/100 ($250,000.00) Dollars as total consideration for the purchase of the assets, Seller's goodwill, Seller's Covenant Not To Compete and business transition services which sum shall be paid as follows:

1.    Upon the execution of this Agreement, the sum of Five Hundred and 00/100 ($500.00) Dollars shall be paid to Seller, to be applied to the purchase price.

2.    The sum of Two Hundred Forty-nine Thousand Five Hundred ($249,500.00) Dollars (subject to any adjustments specified in this Agreement, which may decrease the amount due), which shall constitute a portion of the Purchase Price for the Acquired Assets shall be paid at the closing, by certified check good the day of the Closing.

3.    Allocation of Purchase Price. The Purchase Price shall be allocated among the Purchased Assets in accordance with the preliminary Allocation Schedule set forth below (the "**Allocation Schedule**"). A draft of the final Allocation Schedule shall be prepared by Buyer in a manner consistent with the preliminary Allocation Schedule and delivered to Seller within 2 days following the execution of this agreement; If Seller notifies Buyer in writing that Seller objects to one or more items reflected in the proposed final Allocation Schedule, Seller and Buyer shall negotiate in good faith to resolve such dispute; *provided, however,* that if Seller and Buyer are unable to resolve any dispute with respect to the Allocation Schedule within 6 days following the execution of this agreement, such dispute shall be resolved by the Independent Accountants. The fees and expenses of the Independent Accountants shall be borne equally by Seller and Buyer. Buyer and Seller shall file all Tax Returns (including amended returns and claims for refund) and information reports in a manner consistent with the Allocation Schedule. Buyer and Seller agree to adhere to such allocation in all reports, returns and other documents filed with any governmental authority. Each of Seller and Buyer will fully comply with Section 1060 of the Internal Revenue Code of 1986, as amended, and the regulations promulgated thereunder (collectively, the **"Code"**), including filing Form 8594 with its federal income Tax Return for the taxable year that includes the date of Closing.

[Type text]

The preliminary allocation of the purchase price shall be as follows:

| | |
|---|---|
| Inventory | $100,000.00 |
| Equipment and furnishing | $ 25,000.00 |
| Covenant Not to Compete | $ 75,000.00 |
| Customer List | $ 25,000.00 |
| Goodwill | $ 25,000.00 |

4.    Buyer shall lease approximately ~~3320~~ 3470 square feet of Sellers building located at 1300 Pickens Street, Col., S.C., 29201 pursuant to the terms of the lease agreement attached hereto as Exhibit "J".

5.    Buyer shall pay Seller $2,000.00 per month for utilities, maintenance, janitorial service, collection support fees, printer/scanner support fees, including, but not limited to the Kyocera FS-4000DN, and office phone service all transferable or assignable telephone and telecopier numbers associated with phone lines terminating at the locations at which the Business is conducted and all toll-free telephone numbers used in the Business, all to run co-terminously with the length of the above-referenced lease.

6.    Buyer shall pay Seller $200.00 per month as its share for the two printers, _____ service and the mail machine.

7.    Buyer shall be entitled to 90 day's use of the computer network service and Seller shall provide at its cost the installation of a separate service for Buyer's use after which Buyer shall pay the monthly cost of same.

2.4    <u>The Closing</u>.  The closing of the transactions contemplated by this Agreement (the "Closing") shall take place at the offices of John D. Medlin, Esquire, 1830 Bull Street, Columbia, South Carolina, 29201, at 9:00 a.m. local time on the 15 day, of April, 2014, or such later date following the satisfaction or waiver of all conditions to the obligations of the Parties to consummate the transactions contemplated hereby as the Parties may mutually determine (the "Closing Date").

2.5    <u>Deliveries at the Closing</u>. At the Closing, (a) the Seller will deliver to the Buyer the various certificates, instruments, and documents referred to in Section 7.1 below; (b) the Buyer will deliver to the Seller the various certificates, instruments, and documents referred to in Section 7.2 below; (c) the Seller will execute, acknowledge (if appropriate), and deliver to the Buyer (i) the Bill of Sale attached hereto as Exhibit "G" and (ii) such other instruments of sale, transfer, conveyance, and assignment as

[Type text]

**EXHIBIT "A", Page 6 of 47**

the Buyer and its counsel may request.

## ARTICLE III

### Representations and Warranties of the Seller

3.1 Organization and Good Standing. Seller is a professional association duly organized, validly existing, and in good standing under the laws of the State of South Carolina and is duly qualified or licensed and in good standing as a foreign company authorized to do business in each jurisdiction where Seller is conducting the Business or where the nature of the activities conducted by Seller in connection with the Business or the location of the assets or properties of the Business requires Seller to be so qualified or licensed, other than any such jurisdiction where the failure to be so qualified or licensed would not have a material adverse effect on the Business. Such jurisdictions in which Seller is so qualified or licensed are listed on

Seller has full power and authority to conduct its business as it is now being conducted, to own or use the properties and assets that it purports to own or use, and to perform all obligations under this Agreement.  The Seller represents and warrants to the Buyer that the statements contained in this Article III are correct and complete as of the date of this Agreement and will be correct and complete as of the Closing Date (as though made then and as though the Closing Date were substituted for the date of this Agreement throughout this Article III), except as set forth in the Disclosure Schedule accompanying this Agreement as Exhibit "H" and incorporated herein by reference and initialed by the Parties (the Disclosure Schedule). As to the Seller, the Disclosure Schedule will be arranged in paragraphs corresponding to the lettered and numbered paragraphs contained in this Article III.

3.2 Authorization of Transaction. The Seller has full power and authority to execute and deliver this Agreement and to perform its obligations hereunder. Without limiting the generality of the foregoing, any person, including without limitation any suppliers, regulatory authorities, lenders, secured parties, Lessors and any and all other creditors or other persons with any interest in or having a claim or lien against the Business or its Assets or against Seller or its assets have consented to the

[Type text]

**EXHIBIT "A", Page 7 of 47**

execution, delivery, and performance of this Agreement by the Seller, including, without limitation, the conveyance of the Assets free and clear of any and all claims, liens, security interests, restrictions against transfer or other encumbrances. This Agreement constitutes the valid and legally binding obligation of the Seller, enforceable in accordance with its terms and conditions. The Seller has good and marketable title to all of the Acquired Assets, free and clear of any Security Interest, restriction on transfer or other liens or encumbrances.

3.3 _Non-contravention_. Neither the execution and the delivery of this Agreement, nor the consummation of the transactions contemplated hereby (including the assignments and assumptions referred to in Article 11 above), will (a) violate any statute, regulation, rule, judgment, order, decree, stipulation, injunction, charge, or other restriction of any government, governmental agency, or court to which Seller is subject or any provision of the charter or bylaws of the Seller or (b) conflict with, result in a breach of, constitute a default under, result in the acceleration of, create in any party the right to accelerate, terminate, modify, or cancel, or require any notice under any contract, lease, sublease, license, sublicense, franchise, permit, indenture, agreement or mortgage for borrowed money, instrument of indebtedness, Security Interest, or other arrangement to which the Seller is a party or by which it is bound or to which any of its assets is subject (or result in the imposition of any Security Interest upon any of its assets). The Seller does not need to give any notice to, make any filing with, or obtain any authorization, consent, or approval of any government or governmental agency in order for the Parties to consummate the transactions contemplated by this Agreement (including but not limited to the assignments and assumptions referred to in Article II above).

3.4    Tax Matters.  Seller has timely filed all federal, state, local and foreign (if any) tax or information returns (including estimated tax returns) (collectively, "**Tax Returns**") required under the statutes, rules or regulations of such jurisdictions to be filed by Seller. The term "**Taxes**" means taxes, duties, charges or levies of any nature imposed by any taxing or other governmental or regulatory authority (including interest, penalties or additions to tax in respect of the foregoing).  All Taxes due from, or payable by, Seller have been paid including, but not limited to taxes on personal property

[Type text]

conveyed by Seller pursuant to this agreement and Seller has collected all sales, use, goods and services or other commodity Taxes required to be collected and remitted or will remit the same to the appropriate taxing authority within the prescribed time periods. No examination of any return of Seller is currently in progress, and Seller has not received notice of any proposed audit or examination. No deficiency in the payment of Taxes by Seller for any period has been asserted in writing by any taxing authority and remains unsettled at the date of this Agreement. Seller has not made any agreement, waiver or other arrangement providing for an extension of time with respect to the assessment or collection of any Taxes against it.

3.5 <u>Employee Benefit Plans</u>. There are no pension, profit sharing, retirement, health insurance, medical reimbursement or other employee welfare benefit or retirement benefit plans or agreements covering Seller's employees for which seller have any liability.

3.6 <u>Events Subsequent to Effective Date</u>. Since the __14th__ day of __April__, 2014, and other than as indicated on Exhibit "_K_" attached hereto, there has not been any Adverse Change in the business, operations, results of operations, or future prospects of the Seller.

3.7 <u>Brokers' Fees</u>. The Seller has no Liability or obligation to pay any fees or commissions to any broker, finder, or agent with respect to the transactions contemplated by this Agreement.

3.8 <u>Disclosure</u>. The representations and warranties contained in this Article III do not contain any untrue statement of a fact or omit to state any fact necessary in order to make the statements and information contained in this Article III not misleading.

3.9 <u>Contracts</u>. Exhibit "E" hereto contains an accurate and complete list of all existing agreements, commitments, leases, licenses, instruments or other contracts relating only to the Business (including the Real Property Lease and the Permits) to which Seller is a party or any Purchased Assets are bound (collectively the "**Contracts**," each a "**Contract**"). For avoidance of doubt, the Purchased Contracts consist only of those Contracts that Buyer has affirmatively elected

[Type text]

to purchase and assume by assignment and assumption agreement attached hereto as Exhibit "L".

Each Contract is in full force and effect, and there exists no default or event of default by Seller or,

to the knowledge of Seller and Selling Member, by any other person, or occurrence, condition, or

act (including the purchase of the Purchased Assets hereunder) which, with the giving of notice, the

lapse of time or the happening of any other event or condition, would become a default or event

of default thereunder by Seller and there are no outstanding or, to the knowledge of Seller,

threatened claims of breach or indemnification or notices of default or termination of any such

Contract. Seller has not received any advance payments against the Contracts.

3.10  Title to Purchased Assets. Except as otherwise disclosed herein or in or

any Schedule or Exhibit attached hereto, Seller owns good and marketable title in fee simple to the

Purchased Assets, free and clear of all other claims of ownership, leases, licenses, easements, liens,

Encumbrances, charges, security interests, conditions and restrictions. For purposes of this Agreement,

**"Encumbrance"** means any mortgage, pledge, lien, encumbrance, charge, or other security

interest, and "**Permitted Encumbrances**" means the Encumbrances as permitted

and accepted by Buyer.

[Type text]

## ARTICLE IV

### Representations and Warranties of the Buyer

The Buyer represents and warrants to the Seller that the statements contained in this Article IV are correct and complete as of the date of this Agreement and will be correct and complete as of the Closing Date (as though made then and as though the Closing Date were substituted for the date of this Agreement throughout this Article IV), except as set forth in the Disclosure Schedule accompanying this Agreement as Exhibit "_H_ ". As to the Buyer, the Disclosure Schedule will be arranged in paragraphs corresponding to the lettered and numbered paragraphs contained in this Article IV.

4.1 <u>Organization of the Buyer</u>. The Buyer is a Limited Liability Company, duly organized validly existing and in good standing under the laws of South Carolina, its state of incorporation; and is authorized to do business in all jurisdictions in which such authorization is required.

4.2 <u>Authorization of Transaction</u>. The Buyer has full corporate power and authority to execute and deliver this Agreement and to perform its obligations hereunder. This Agreement constitutes the valid and legally binding obligation of the Buyer, enforceable in accordance with its terms and conditions.

4.3 <u>Non-contravention</u>. Neither the execution and the delivery of this Agreement, nor the consummation of the transactions contemplated hereby (including the assignments and assumptions referred to in Article 11 above), will (a) violate any statute, regulation, rule, judgment, order, decree, stipulation, injunction, charge, or other restriction of any government, governmental agency, or court to which the Buyer is subject or any provision of its charter or bylaws or (b) conflict with, result in a breach of, constitute a default under, result in the acceleration of, create in any party the right to accelerate, terminate, modify, or cancel, or require any notice under any contract, lease, sublease, license, sublicense, franchise, permit, indenture, agreement or mortgage for borrowed

35

money, instrument of indebtedness, Security Interest, or other arrangement to which the Buyer is a party or by which it is bound or to which any of its assets is subject. The Buyer does not need to give any notice to, make any filing with, or obtain any authorization, consent, or approval of any government or governmental agency in order for the Parties to consummate the transactions contemplated by this Agreement (including the assignments and assumptions referred to in Article II above).

4.4 <u>Brokers' Fees</u>.  The Buyer has no obligation to pay fees and/or commissions to broker with respect to the transactions contemplated by this Agreement.

ARTICLE V

<b><u>Pre-Closing Covenants</u></b>

5.1 <u>General</u>.  Each of the Parties will use its reasonable best efforts to take all action and to do all things necessary, proper, or advisable to consummate and make effective the transactions contemplated by this Agreement (including satisfying the closing conditions set forth in Article VII below).

5.2  <u>Notices and Consents</u>.  The Seller will give any notices to third parties, and the Seller will obtain any third party consents that the Buyer may request in connection with the matters pertaining to the Business or which are disclosed or required to be disclosed in the Disclosure Schedule.  Each of the Parties will take any additional action that may be necessary, proper, or advisable in connection with any other notices to, filings with, and authorizations, consents, and approvals of governments, governmental agencies, and third parties that it may be required to give, make, or obtain.

5.3 <u>Operation of Business</u>. The Seller will not cause or permit the Business to engage in any practice, take any action, embark on any course of inaction, or enter into any transaction outside the Ordinary Course of Business.

5.4 <u>Preservation of Business</u>. The Seller will keep its business and properties of the

35

Business substantially intact, including its present operations, physical facilities, working conditions, and relationships with lessors, licensors, suppliers, customers, and employees.

5.5 <u>Full Access</u>. The Seller will permit representatives of the Buyer to have full and complete access to all premises, properties, books, records, contracts, Tax records, and documents of or pertaining to the Business, from and after the execution of this Agreement, and shall cause Seller's employees, agents and attorneys to cooperate fully and to answer completely and truthfully any and all questions or other inquiries made by Buyer in the conduct of Buyer's investigation of the Business in connection with the proposed purchase of the Acquired Assets.

5.6 <u>Notice of Developments</u>. The Seller will give prompt written notice to the Buyer of any material development affecting the assets, Liabilities, business, financial condition, operations, results of operations, or future prospects of the Business. Each Party will give prompt written notice to the other of any material development affecting the ability of the Parties to consummate the transactions contemplated by this Agreement. No disclosure by any Party pursuant to this Section 5.6, however, shall be deemed to amend or supplement the Disclosure Schedule or to prevent or cure any misrepresentation, breach of warranty, or breach of covenant.

5.7 <u>Exclusivity</u>. The Seller will not (a) solicit, initiate, or encourage the submission of any proposal or offer from any person relating to any (i) liquidation, dissolution, or recapitalization, (ii) merger or consolidation, (iii) acquisition or purchase of securities or assets, or (iv) similar transaction or business combination involving the Business or (b) participate in any discussions or negotiations regarding, furnish any information with respect to, assist or participate in, or facilitate in any other manner any effort or attempt by any person to do or seek any of the foregoing. The Seller will notify the Buyer immediately if any person makes any proposal, offer, inquiry, or contact with respect to any of the foregoing.

**ARTICLE VI**

**Post Closing Covenants**

35

The Parties agree as follows with respect to the period following the Closing.

6.1  <u>General</u>.  In case at any time after the Closing any further action is necessary or desirable to carry out the purposes of this Agreement, each of the Parties will take such further action (including but not limited to the execution and delivery of such further instruments and documents) as the other Party reasonably may request, all the sole cost and expense of the requesting Party (unless the requesting Party is entitled to indemnification therefor under Article VIII below).

6.2  <u>Covenant Not to Compete</u>.  Seller and Guarantor agree to enter into a covenant not to compete in the form attached hereto as Exhibit "I" and incorporated herein by reference, which shall remain in effect, for the two year period from the closing date.

6.3  <u>Taxes</u>.  Seller agrees to be liable for any sales, use or other taxes arising out of Buyer's purchase of the Acquired Assets from Seller.

### ARTICLE VII

### Conditions to Obligation to Close

7.1  <u>Conditions to Obligation of the Buyer</u>.  The obligation of the Buyer to consummate the transactions to be performed by it in connection with the Closing is subject to satisfaction of the following conditions:

(1)   the representations and warranties set forth in Article III above shall be true and correct in all material respects at and as of the Closing Date;

(2)   the Seller shall have performed and complied with all of its covenants hereunder in all material respects through the Closing;

(3)   the Seller shall have procured all of the third party consents specified in Section 5.2 above;

(4)   the relevant parties shall have entered into side agreements in form and substance as set forth in Exhibits identified throughout this Agreement attached hereto and the same shall be in full force and effect; and

(5)   all actions to be taken by the Seller in connection with consummation of the transactions contemplated hereby and all certificates, opinions, instruments, and

35

other documents required to effect the transactions contemplated hereby will be satisfactory in form and substance to the Buyer.

(6)    Buyer shall be satisfied, as Buyer shall determine solely within Buyer's discretion and judgment, with the results of it's investigation of the Business pursuant to Section 5.5 above.

(7)    Approval and funding of a loan with National Bank of South Carolina in the amount of $250,000.00 to finance the purchase of the assets.

The Buyer may waive any condition specified in this Section 7.1 if it executes a writing so stating at or prior to Closing.

7.2    <u>Conditions to Obligation of the Seller</u>.  The obligation of the Seller to consummate the transactions to be performed by it in connection with the Closing is subject to satisfaction of the following conditions:

(1)    the representations and warranties set forth in Article IV above shall be true and correct in all material respects at and as of the Closing Date;

(2)    the Buyer shall have performed and complied with all of its covenants hereunder in all material respects through the Closing;

(3)    the relevant parties shall have entered into side agreements in form and substance as set forth in Exhibits identified throughout this Agreement and the same shall be in full force and effect; and

(4)    all actions to be taken by the Buyer in connection with consummation of the transactions contemplated hereby and all certificates, opinions, instruments, and other documents required to effect the transactions contemplated hereby will be satisfactory in form and substance to the Seller.

The Seller may waive any condition specified in this Section 7.2 if it executes a writing so stating at or prior to the Closing.

**ARTICLE VIII**

**<u>Remedies for Breaches of This Agreement</u>**

8.1    <u>Survival</u>.   All of the representations, warranties, and covenants of the Buyer and the Seller contained in this Agreement shall survive the Closing (even if the damaged Party knew or had

35

reason to know of any misrepresentation or breach of warranty or covenant at the time of Closing) and continue in full force and effect forever thereafter.

8.2  Indemnification Provisions for Benefit of the Buyer.  The Seller agrees to indemnify the Buyer from and against the entirety of any Adverse Consequences the Buyer may suffer resulting from, arising out of, relating to, in the nature of, or caused by:

(1)     any breach of any of the Seller's representations, warranties, and covenants contained in this Agreement;

(2)     any Liability of the Seller (including with respect to the Business) which is not an Assumed Liability;

(3)     any Liability of the Buyer arising by operation of law (including under any bulk transfer law of any jurisdiction or under any common law doctrine of defacto merger or successor liability) which is not an Assumed Liability; or

8.3   Other Indemnification Provisions.  The foregoing indemnification provisions are in addition to, and not in derogation of, any statutory or common law remedy any Party may have for breach of representation, warranty, or covenant.

## ARTICLE IX

### Miscellaneous

9.1  No Third Party Beneficiaries.  This Agreement shall not confer any rights or remedies upon any person other than the Parties and their respective successors and permitted assigns.

9.2  Entire Agreement.  This Agreement (including the documents referred to herein) constitutes the entire agreement between the Parties and supersedes any prior understandings, agreements, or representations by or between the Parties, written or oral, that may have related in any way to the subject matter hereof.

9.3  Succession and Assignment.  This Agreement shall be binding upon and inure to the benefit of the Parties named herein and their respective successors and permitted assigns. No Party may assign either this Agreement or any of its rights, interests, or obligations hereunder without the

35

prior written approval of the other Party; provided, however, that the Buyer may (a) assign any or all of its rights and interest hereunder to one or more of its Affiliates and (b) designate one or more of its Affiliates to perform its obligations hereunder (in any or all of which cases the Buyer nonetheless shall remain liable and responsible for the performance of all of its obligations hereunder).

9.4  <u>Counterparts</u>.  This Agreement may be executed in one or more counterparts, each of which shall be deemed an original but all of which together will constitute one and the same instrument.

9.5  <u>Headings</u>.   The section headings contained in this Agreement are inserted for convenience only and shall not affect in any way the meaning or interpretation of this Agreement.

9.6  <u>Notices</u>.  All notices, requests, demands, claims, and other communications hereunder will be in writing. Any notice, request, demand, claim, or other communication hereunder shall be deemed duly given if (and then two business days after) it is sent by registered or certified mail, return receipt requested, postage prepaid, and addressed to the intended recipient as set forth below:

|  |  |
|---|---|
| If to the Seller: | Korn Law Firm, P.A. of South Carolina<br>1300 Pickens Street<br>Columbia, South Carolina 29201 |
| If to the Buyer: | Clarkson and Korn, LLC<br>P.O. Box 287<br>Columbia, South Carolina  29202 |

Any party may give any notice, request, demand, claim, or other communication hereunder using any other means (including personal delivery, expedited courier, messenger service, telecopy, telex, ordinary mail, or electronic mail), but no such notice, request, demand, claim, or other communication shall be deemed to have been duly given unless and until it actually is received by the individual for whom it is intended. Any Party may change the address to which notices, requests, demands, claims, and other communications hereunder are to be delivered by giving the other Party notice in the manner herein set forth.

35

**EXHIBIT "A", Page 17 of 47**

9.7    <u>Governing Law</u>.  This Agreement shall be governed by and construed in accordance with the internal laws of the State of South Carolina.

9.8    <u>Amendments and Waivers</u>.  No amendment of any provision of this Agreement shall be valid unless the same shall be in writing and signed by the Buyer and the Seller. No waiver by any Party of any default, misrepresentation, or breach of warranty or covenant hereunder, whether intentional or not, shall be deemed to extend to any prior or subsequent default, misrepresentation, or breach of warranty or covenant hereunder or affect in any way any rights arising by virtue of any prior or subsequent such occurrence.

9.9    <u>Severability</u>.  Any term or provision of this Agreement that is invalid or unenforceable in any situation in any jurisdiction shall not affect the validity or enforceability of the remaining terms and provisions hereof or the validity or enforceability of the offending term or provision in any other situation or in any other jurisdiction. If the final judgment of a court of competent jurisdiction declares that any term or provision hereof is invalid or unenforceable, the Parties agree that the court making the determination of invalidity or unenforceability shall have the power to reduce the scope, duration, or area of the term or provision, to delete specific words or phrases, or to replace any invalid or unenforceable term or provision with a term or provision that is valid and enforceable and that comes closest to expressing the intention of the invalid or unenforceable term or provision, and this Agreement shall be enforceable as so modified after the expiration of the time within which the judgment may be appealed.

9.10    <u>Construction</u>.  The language used in this Agreement will be deemed to be the language chosen by the Parties to express their mutual intent, and no rule of strict construction shall be applied against any Party. Any reference to any federal, state, or local statute or law shall be deemed also to refer to all rules and regulations promulgated thereunder, unless the context requires otherwise. Nothing in the Disclosure Schedule, attached on Exhibit "J", shall be deemed adequate to disclose an exception to a representation or warranty made herein unless the

35

Disclosure Schedule identifies the exception with particularity and describes the relevant facts in detail. Without limiting the generality of the foregoing, the mere listing (or inclusion of a copy) of a document or other item shall not be deemed adequate to disclose an exception to a representation or warranty made herein (unless the representation or warranty has to do with the existence of the document or other items itself). The Parties intend that each representation, warranty, and covenant contained herein shall have independent significance. If any Party has breached any representation, warranty, or covenant herein in any respect, the fact that there exists another representation, warranty, or covenant relating to the same subject matter (regardless of the relative levels of specificity) which the Party has not breached shall not detract from or mitigate the fact that the Party is in breach of the first representation, warranty, or covenant.

9.11  Bulk Transfer Laws.  The Seller will fully and completely comply with the provisions of any bulk transfer laws of any jurisdiction in connection with the transactions contemplated by this Agreement, and Seller agrees to assume any and all risks of liability arising if Seller fails to so comply with the Bulk Transfer Laws, if indeed any such compliance is necessary.

9.12  Specific Performance.  Each of the Parties acknowledges and agrees that the other Parties would be damaged irreparably in the event any of the provisions of this Agreement are not performed in accordance with their specific terms or otherwise are breached. Accordingly, each of the Parties agrees that the other Parties shall be entitled to an injunction or injunctions to prevent breaches of the provisions of this Agreement and to enforce specifically this Agreement and the terms and provisions hereof in any action instituted in any court of the United States or any state thereof having jurisdiction over the Parties and the matter (subject to the provisions set forth in Section 9.13 below), in addition to any other remedy to which it may be entitled, at law or in equity.

9.13  Submission to Jurisdiction. Each of the Parties submits to the jurisdiction of any state or federal court sitting in South Carolina, in any action or proceeding arising out of or relating to this Agreement, agrees that all claims in respect of the action or proceeding may be heard and

35

determined in any such court, and agrees not to bring any action or proceeding arising out of or relating to this Agreement in any other court. Each of the Parties waives any defense of inconvenient forum to the maintenance of any action or proceeding so brought and waives any bond, surety, or other security that might be required of any other Party with respect thereto. Any Party may make service on the other Party by sending or delivering a copy of the process to the Party to be served at the address and in the manner provided for the giving of notices in Section 9.6 above. Nothing in this Section 9.13, however, shall affect the right of any Party to serve legal process in any other manner permitted by law. Each Party agrees that a final judgment in any action or proceeding so brought shall be conclusive and may be enforced by suit on the judgment or in any other manner provided by law.

9.14 Incorporation of Exhibits and Schedules. The Exhibits and Schedules identified in this Agreement are incorporated herein by reference and made a part hereof.

**IN WITNESS WHEREOF**, the Parties hereto have executed this Agreement on the date first above written.

WITNESSETH:

Buyer:

Clarkson and Korn, LLC

BY: _____
Wylie W. Clarkson, Managing Member

SELLER:

Korn Law Firm, P.A. of South Carolina

BY: _____
Peter D. Korn

GUARANTOR:

_____
Peter D. Korn

35

STATE OF SOUTH CAROLINA      )
                             )          **PROBATE**
COUNTY OF RICHLAND           )

PERSONALLY appeared the undersigned witness and made oath that (s)he saw the within named  Clarkson and Korn, LLC by Wylie W. Clarkson, Managing Member, sign, seal and, as his act and deed, deliver the within Asset Purchase Agreement and that (s)he with the other witness subscribed above, witnessed the execution thereof.

Sworn to before me this 14 day of April, 2014

Notary Public for South Carolina
My Commission Expires: 5|16|2018

STATE OF SOUTH CAROLINA      )
                             )          **PROBATE**
COUNTY OF RICHLAND           )

> Wylie W. Clarkson

PERSONALLY appeared the undersigned witness and made oath that (s)he saw the within named  L. Wayne Strawbridge, Jeffery C. Rayman and Charles T. Edwards, Jr., Personal Guarantors for Clarkson and Korn, LLC, sign, seal and, as their act and deed, deliver the within Asset Purchase Agreement and that (s)he with the other witness subscribed above, witnessed the execution thereof.

Sworn to before me this 3rd 11
day of April, 2008. 2014

Notary Public for South Carolina
My Commission Expires: 5/16/2018

STATE OF SOUTH CAROLINA      )
                             )          **PROBATE**
COUNTY OF RICHLAND           )

PERSONALLY appeared the undersigned witness and made oath that (s)he saw the within named Korn Law Firm, P.A. a South Carolina Professional Association, by Peter D. Korn, its ___President___ sign, seal and, as his act and deed, deliver the within Asset Purchase Agreement and that (s)he with the other witness subscribed above, witnessed the execution thereof.

Sworn to before me this 11th
day of April, 2014.

Notary Public for South Carolina
My Commission Expires: 5/10/2018

35

**EXHIBIT "A", Page 21 of 47**

## LIST OF EXHIBITS

| **Exhibit** | **Description** |
| --- | --- |
| A | Equipment, Furniture, Fixtures and Inventory |
| B | Excluded Assets |
| C | Customer List |
| D | Other Acquired Assets |
| E | Assumed Liabilities and Contract Rights |
| F | Transferred Employees |
| G | Bill of Sale |
| H | Disclosure Schedule |
| I | Non-competition Agreement |
| J. | Lease Agreement |
| K. | Adverse changes |
| L. | Assignment and Assumption Agreement |

**EXHIBIT "A", Page 22 of 47**

## EXHIBIT - A

### Equipment, Furniture, Fixtures and Inventory

**Computers:**
Dell Latitude:  E6500/Serial#CSYDBS1
Dell  Optiplex:  360/Serial #7HMX6J1
Dell  Optiplex:  380/Serial# 45828P1
Dell  Optiplex:  380/Serial# 9V57NM1
Dell  Optiplex:  380/Serial# 5F5HQL1
Dell  Optiplex:  380/Serial# 45728P1
Dell  Optiplex:  380/Serial# 5F6DQL1
Dell  Optiplex:  380/Serial#GMRSMN1
Dell  Optiplex:  380/Serial#5F6CQL1
Dell  Optiplex:  380/Serial#5F5FQL1
Dell  Optiplex:  380/Serial#1QSCPm1

**Monitors:**
20 - 19" Dell LCD monitors
1 - 24" Dell LCD monitor

**Printers:**
HP Laser Jet 1200series

**Accessories:**
11 – Dell mice
11 – Dell Keyboards
1 – SwingLine electric stapler
1 – Fellowes shredder (P5-79Ci)

**Furniture:**
All desks, chairs and shelves within the lease area

35